IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 15, 2016 Session

**STATE OF TENNESSEE v. TONY EDWARD BIGOMS**

**Appeal from the Criminal Court for Hamilton County**
**No. 286393     Barry A. Steelman, Judge**

**No. E2015-02475-CCA-R3-CD**

ROBERT H. MONTGOMERY, JR., J., concurring in the results, in which TIMOTHY L. EASTER, J., joins.

All members of the panel agree that the Defendant must receive a new trial, although we disagree, in part, about the reasons why a new trial is required. Specifically, Judge Easter and I disagree with Judge Thomas's analysis regarding whether a jury separation occurred when the jurors were allowed to speak with family members by telephone while in the presence of court officers, and we conclude that no separation occurred. Likewise, Judge Easter and I depart from Judge Thomas's analysis of the trial court's admission of evidence related to the Defendant's knowledge of DNA matters due to his presence at a prior judicial proceeding at which expert DNA proof was received. Although Judge Easter and I agree with Judge Thomas that the evidence was inadmissible, we disagree with his analysis pursuant to Tennessee Rule of Evidence 404(b) and believe, instead, that the proper framework for determining the admissibility of the evidence is provided by Rules 401, 402, and 403.

**Jury Separation**

The lead opinion concludes that two impermissible jury separations occurred: first, when the jurors were allowed to go home unattended to pack because they were to be sequestered, and second, when they were permitted, during the trial, to make telephone calls to non-jurors while the jurors were in the presence of court officers who could hear the jurors' conversations but could not hear what was said by the people with whom the jurors spoke. I agree with the views stated in the lead opinion relative to the trial court's error in having permitted the jurors to go home unattended to pack, and I believe this error warrants a new trial.

I disagree, however, that an impermissible jury separation occurred when the jurors were permitted to make telephone calls in the presence of court officers. As the lead opinion notes, the jurors did not retain possession of their cell phones but were allowed to use them in the presence of court officers while the jurors were in small groups of three to five. The court officers could hear the jurors speaking on their phones, but they did not monitor what was said by those with whom the jurors spoke during the calls.

Two of the four court officers who supervised the jury during the trial testified at the hearing on the motion for a new trial. Officer Tim Higgs testified that the jurors were only permitted to call their family members, that the trial judge specified that an officer must be present at all times to monitor the calls, and that the conversations he monitored related to family matters and not to the trial. He said that he heard everything the jurors in his charge said and that he did not hear any impermissible discussion. Officer Jim Pickett testified that, with the court's permission, the jurors were permitted to "call home." He said that the jurors were told they were not allowed to talk about the trial with their family members and that he listened to the conversations of the jurors whose calls he supervised to ensure they complied with the instructions. Both officers testified that they did not have any indication of the jurors' having received outside information about the case.

The jury foreman testified at the hearing on the motion for a new trial, as well. He stated that the jurors were permitted to make brief calls to family members in the presence of a court officer. He said he was unaware of any jurors obtaining information about the case outside of the courtroom, and he said his family members did not discuss the case in his telephone calls with them.

In its order denying the motion for a new trial, the trial court made the following findings of fact:

Officer Higgs was responsible for supervising the jury during the sequestration. He worked along with three other court officers . . . . Officer Higgs was present at the hotel when the jurors returned from packing their belongings and upon their arrival the jurors were asked whether they possessed any items which the Judge had instructed them not to bring, such as electronic devices. The jurors['] cell phones were collected from them upon their arrival at the hotel. Officer Higgs recalled that the Court admonished the jurors before they left the Courthouse to pack their belongings that they should not discuss the case with their family and that such was the habit of the Court in prior cases. . . . The Court instructed the jury every evening not to learn about the case from any

-2-

outside source and not to discuss the case with anyone or among themselves and the Court inquired every morning as to whether the jurors had followed these instructions. Officer Higgs did not observe anything or any activity by any of the jurors that appeared to reflect an attempt to violate any orders of the Court.

While the jurors were sequestered their cell phones were kept in one location under the control of a court officer. On two or three occasions, three, four, or five jurors came to Officer Higgs' room where he dialed a requested phone number for the juror and the juror was given ten minutes to make a phone call in the officer's presence. These phone calls were to family members of the jurors and at least two of the jurors were mothers who were talking to their children. Some jurors never made such phone calls. Higgs never heard any discussion regarding the trial. All of the calls were made within three feet of him in his room. Officer Higgs could hear all of the things said by the jurors and some of the things said by those to whom the jurors were talking. Officer Higgs could not hear all of the things that were said by those to whom the jurors were talking. . . .

. . . .

Officer Jim Pickett supervised the jury during the sequestration. He did this along with three other court officers. He never saw or heard anything that led him to believe that any of the jurors were getting information about the case from outside the courtroom. Officer Pickett did not keep any of the jurors['] cell phones in his possession. Officer Higgs held the cell phones belonging to the male jurors and Officer Burnette held the cell phones belonging to the female jurors. The jurors would go to a specific officer's room where the phones were kept and three or four jurors would be in each room with the officer. [Officer] Pickett described the nature of the phone calls as "very limited" and [stated] that the calls were made often although not every night of the sequestration. Officer Pickett was present for some of the phone conversations and he never heard a juror attempting to talk about the case. . . .

[The] Jury Foreman . . . recalled that during the trial jurors were allowed to go into an officer's room, that the officer would hand the juror the juror's cell phone and that the juror would be allowed to call family for approximately five minutes. The officers kept the jurors['] cell phones and the calls were made in the presence of the officer. He called home every night. He never became aware that any juror was gathering information

about the case outside of the courtroom. None of his family members ever gave him any information about the case. None of his family members mentioned to him anything that was going on in the news. He never heard any juror talking about the case with a family member on a cell phone. During his service as Foreman of the Jury he did not learn that anybody had obtained any information about the case outside of the courtroom. . . . Throughout the entire time that he was with the other jurors, the entire time of sequestration, he did not ever hear any of the jurors talking about information about the case that they obtained from any outside source other than in the courtroom. He never had any concerns that any of the jurors had seen any media or new stories about the case. He never heard any information at all, or input about the case, other than what was presented in the courtroom. He recalled the phone calls from the jurors occurring every night and he did not recall anyone who did not make a phone call on a regular basis. . . . He did not hear all of what was said to the jurors on the other end of their cell phones[.] . . .

. . . .

The record reflects that when the jury entered the courtroom each day, and prior to the jury's exiting the courtroom each day, the Court instructed the jury to follow the Court's admonitions about not discussing the case or learning about the case from any source outside the courtroom and the Court inquired whether the jury had followed those instructions. . . .

The trial court found that the jurors "were sufficiently under the control of the court officers such that they remained sequestered" when they made the cell phone calls to their family members. The court also found that "the procedure of requiring the jurors to make the phone calls in small groups in the presence of and close proximity to a supervising court officer satisfied the sequestration requirements." The court stated that alternatively, to the extent that the procedure employed might be viewed as having constituted a separation of the jury, "the Court finds that the answers under oath, each day, by each juror to the Court's inquiry regarding whether the jurors had gained any information about the case outside of the courtroom reflect that there was no prejudice to the defendant." The court also found, "The post-trial testimony of the jury Foreman further establishes this lack of prejudice."

The first inquiry, of course, is whether a separation of the jury occurred in the case at bar when the jurors called family members in the presence of court officers. The lead opinion concludes that one did. For reasons that I will explain, I conclude otherwise.

-4-

The lead opinion analogizes the present case to an older, unpublished opinion of this court, *State v. Tracey Pendergrass*, No. 03C01-9608-CC-00310 1997 WL 760724 (Tenn. Crim. App. Dec. 11, 1997); *perm. app. denied* (Tenn. Sept. 21, 1998). The lead opinion notes the factual similarity that, in both cases, jurors made telephone calls in the presence of court officers who heard only the jurors' side of the conversations. In *Tracey Pendergrass*, a court officer testified at a hearing on the defense's motion for a mistrial that the officer heard the jurors' portions of the calls, which she said related to the jurors' requesting that the people they called bring clothing and leave it in the jurors' cars. The trial court found that nothing improper occurred and that the defendant had not been prejudiced by the calls. This court held, without analysis, that a jury separation occurred but that the trial court applied an incorrect test in considering the defendant's motion for a mistrial. This court said that once the defendant establishes the fact of a jury separation, the prosecution may explain the separation by showing that no communication with non-jurors occurred or that any communication was unrelated to the matter on trial and that the jurors formed no impressions, aside from those based upon the testimony. If the prosecution establishes that no prejudice occurred, a harmless error analysis may be conducted. Accordingly, this court remanded the case for an evidentiary hearing and for the trial court to consider the question of juror separation in accord with these principles. *See Tracey Pendergrass*, 1997 WL 760724, at *7-9 (relying on *Hines v. State*, 27 Tenn. 597, 602 (1848)).

I disagree with the *Tracey Pendergrass* panel's summary conclusion that a jury separation occurred when jurors made telephone calls in front of court officers and in the absence of any evidence the calls pertained to the facts of the trial. In 1999, our supreme court noted that the purpose of the sequestration rule is "to preserve a defendant's right to a fair trial and an impartial jury by protecting jurors from outside influences so that the verdict will be based only upon evidence developed at trial." *State v. Bondurant*, 4 S.W.3d 662, 671 (Tenn. 1999). I believe that the procedures followed in the present case were consistent with this purpose and were sufficient to maintain the sequestration of the jury.

In this regard, I believe the present case is factually similar to *James Dellinger and Gary Wayne Sutton v. State*, No. E2004-01068-CCA-R3-PC, 2006 WL 1679595, at *22-23 (Tenn. Crim. App. June 19, 2006), *perm. app. denied* (Tenn. Oct. 30, 2006). As the lead opinion notes, *James Dellinger* involved a "family night" event during a trial with a sequestered jury. Court officers supervised the jurors and the jurors' visiting family members in a large room. The jurors were instructed not to discuss the case, and, although court officers were present, they did not monitor individual conversations between the jurors and the family members. This court concluded that the petitioners failed to show that the jurors were "outside the presence of the court officers during the family gathering" and that the petitioners were not entitled to post-conviction relief based

upon a claim that the rule of sequestration had been violated. *James Dellinger*, 2006 WL 1679595, at *21-23.

In my view, the communication that occurred at the family night in *James Dellinger* is analogous to the brief calls the jurors in the present case were permitted to make in the presence of other jurors and a court officer. Although the court officers in neither situation heard every word said, the officers were present continuously and, at least in the case at bar, heard all that the jurors said and some of what was said by the persons the jurors called. In both cases, there was no evidence of any inappropriate communication relative to the trial, and the facts are such that any inappropriate communication would have been evident to the court officers attending the jurors.

I am sensitive, in our world of rapidly evolving electronic connectivity, to the challenges a trial court faces in preventing a jury from being contaminated by extraneous outside information, and thereby, in maintaining a defendant's right to a fair trial by an impartial jury. I am also mindful of the difficulty in determining the boundaries for preventing a separation, given the historical focus on keeping the jurors together physically, the trend toward relaxing the rigidity of the traditional rule, and the ever-advancing reach of electronic connectivity in everyday life.

The jurors in the present case remained within the custody and control of court officers at all times relevant to the telephone calls. The court officers were present, and the jurors were in the presence of other jurors during the calls. The calls were brief, and what the jurors said could be heard by the court officers. The jurors were not allowed to keep their cell phones during the trial, and their only opportunity to use them was brief, supervised, and communal. Neither the testifying court officers nor the jury foreman had any indication that any information relevant to the trial had been received during the telephone calls and, in fact, all indications were to the contrary. In my view, the circumstances and environment in which the calls were made created no meaningful opportunity for a violation of the rule of sequestration to occur, and no evidence shows that one did, in fact, take place.

I note that in the present case, the lead opinion considered the Defendant's argument that a jury separation occurred when the jurors were permitted to have lunch with family members the day before the trial concluded. The lead opinion cites *James Dellinger* as support for its conclusion that no jury separation occurred, a conclusion with which I concur. I see no meaningful distinction, however, between the family lunch, which the lead opinion concludes was not a separation of the jury, and the supervised telephone calls, which the lead opinion concludes was a separation of the jury. In both instances, the jurors were permitted to have supervised communication with non-jurors. The court officers monitored the communications, but they did not hear everything that

was said by all parties. I would hold that the Defendant failed to make a prima facie showing that the rule of sequestration was violated by the supervised telephone calls and, thereby, that the State was not required to establish a lack of prejudice to the Defendant from the telephone calls.

All of this said, however, I agree with the views stated in the lead opinion regarding the separation of the jury when the jurors were permitted to go home to pack and the presumed prejudice therefrom. For this reason, I concur in the lead opinion's conclusion that the convictions must be reversed and the case remanded for a new trial due to jury separation related to the jurors' trips home to pack.

### Admission of Evidence

My second point of departure from the lead opinion pertains to its analysis of the trial court's admission of Agent Turbeville's testimony regarding his previous testimony in a prior judicial proceeding about recovery of DNA. The Defendant had been present at the previous proceeding and, therefore, would have had knowledge of Agent Turbeville's testimony. The State theorized that the Defendant had removed the present victim's head and hands due to the Defendant's knowledge of Agent Turbeville's previous testimony about recovery of DNA evidence from fingernail clippings and an oral swab. The State's theory is intertwined with evidence that the Defendant may have accidentally called the victim on the day of her death and his having her telephone number stored in his cell phone under the name "Dinae," which was similar to both the victim's name, Dana, and the name of the victim from the previous trial, Dinah. The lead opinion analyzes the trial court's ruling on this issue pursuant to Tennessee Rule of Evidence 404(b), even though an analysis of admissibility pursuant to Rule 404(b) was not conducted by the trial court. I believe the proper analysis is pursuant to Rules 401, 402, and 403, which provide the framework utilized by the parties and the court in the trial proceedings. Despite my differing view upon the proper framework for determining the admissibility of this evidence, I agree with the lead opinion's conclusion that the trial court erred in admitting the evidence and that the erroneous admission was not harmless.

In order to be admissible, evidence must be relevant. *See* Tenn. R. Evid. 401, 402. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Rule 404(b) prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait. Tenn. R. Evid. 404(b). Such evidence, though, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of

mistake.  *Id.*; *see State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003).
Before a trial court determines the admissibility of such evidence,

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4).

The trial court in the present case did not conduct an admissibility hearing pursuant to Rule 404(b).  In fact, the State argued to the trial court that Rule 404(b) was inapplicable, a position with which I agree.  The evidence that the State sought to and was allowed to introduce – the fact of the Defendant's knowledge, due to his presence at the prior judicial proceeding, that DNA evidence could be collected from the hands and mouth of an individual – did not constitute an other crime, wrong, or act of the Defendant offered for the purpose of establishing identity, motive, common scheme or plan, intent, or absence of mistake. *See id.*  As such, the Rule 404(b) framework is inapt for analyzing its admissibility.  I believe the evidence of the Defendant's knowledge that DNA could be recovered from a person's hands and mouth was relevant to the question of the Defendant's guilt of the abuse of a corpse charge and, to a somewhat lesser extent, the first degree murder charge.  I acknowledge that the evidence of the Defendant's knowledge regarding DNA evidence recovery could be viewed as probative of the question of his identity as the perpetrator of the charged offenses.  However, the evidence the State sought to introduce – the fact of his knowledge – was not itself a prior bad act and, as such, Rule 404(b) did not apply.

Introduction of the evidence, however, carried with it the inherent risk that the jury would infer that the Defendant had been on trial for Ms. Burney's homicide in the prior judicial proceeding.  I believe this risk was compounded exponentially by the State's argument, "It would take a monster to assign [Dinah Burney's] contact information to Dana Wilkes's telephone number," and its argument that the Defendant's having

-8-

allegedly done so was "frightening," "appalling," "disturbing," and "downright scary." Any inference that the Defendant had been on trial for Ms. Burney's homicide and any further inference that he was guilty of Ms. Wilkes's homicide based upon a prior accusation of homicide relative to a different victim speak directly to the harms Rule 403 seeks to avoid. *See* Tenn. R. Evid. 403. In my view, the danger of unfair prejudice, confusion of the issues, and misleading the jury substantially outweighed the relevance of this evidence, and the trial court erred in admitting it.

Although I depart from the lead opinion's analysis of the basis upon which this evidence should have been excluded, I agree that its admission was not harmless. *See* T.R.A.P. 36(b). I concur, therefore, in the lead opinion's conclusion that the Defendant must receive a new trial.

## Conclusion

Except as expressed in this separate opinion, I concur in all other respects in the lead opinion. I believe that a new trial is warranted due to errors related to separation of the jurors and the erroneous admission of evidence. I am authorized to state that Judge Easter joins in concurring in the results of the lead opinion and in the views expressed in this concurring opinion.

_____
ROBERT H. MONTGOMERY, JR., JUDGE